And will you call the next case please? 3-12-509 Happy R Securities Accompanied by Timothy Howard v. Oquawaka River Terminal Appellate v. Patches & Griffin Mr. Howard May it please the Court, Counsel? My name is Tim Howard, and I represent Happy R Securities LLC. Sometimes I'll refer to it as Happy R, sometimes H-R-S, as the argument goes along. My client is here today to request this Court to reverse a preliminary injunction order that has been entered that is preventing it from foreclosing on a mortgage made by AgResources LLC. The material facts in this case are undisputed. Judge Mangieri did a good job in defining the facts. Today I want to highlight the questions of law, which in applied to the undisputed facts, require reversal of the injunction order. I'll emphasize two arguments in the favor of Oquawaka River Terminal, because it's a mouthful I'll use, I'll just call it O-R-T, to demonstrate likelihood of success in the merits. Now when did McChesney cease to be a member of O-R-T? That's an excellent question. And I look at it several different ways, if I could. In my opinion, he ceased to be a member in the fall of 2010, if you're looking for a precise date. This was confirmed that he was no longer a member as of December 31, 2010, because the Schedule K-1 he received showed that he had a zero percentage interest. And I think the critical question of law, one of the critical questions of law the Court needs to answer, is can a person who has a zero percent interest in an LLC be a member? Just to highlight this, the dates I'm looking at, there was a June 3, 2011 email from McChesney, an attorney saying that McChesney objected to the purchase agreement as a member of O-R-T, and then I agree with you that in the 2010 form shows McChesney has zero capital profit loss interest. And then in July 2011, there was a meeting where I think it was Ryan said that McChesney was out of O-R-T, but then Ryan testified that in March and April 2012, McChesney had an 18% share in O-R-T. Well, I don't know where that came from, because the evidence at the time was that the last Schedule K-1 showed a zero percent interest. Now, with regard to the email sent by... The long and short of all this is when you look at all the conflicting statements, and there were these conflicting statements, doesn't that raise a fair question? No, and here's why. I don't think it raises a fair question, because merely my testimony as a member of O-R-T, merely the attorney, Mr. Barras, claiming in that email that McChesney was a member of O-R-T, does not establish that as a matter of law. And I think the question, the larger question is here, was the August 16, 2010 operating agreement effective when it was signed? Because if it was effective when it was signed, it changed from a member-managed LLC to a manager-managed LLC, and as the Court knows, under a manager-managed LLC, Section 15-3G1 of the LLC Act means the members owe no duties to the company. So there could be no breach of fiduciary duty upon which to base the preliminary injunction. If the Court determines that it continued, and the argument is it continued as a member-managed LLC because they failed to file the amendment to the Articles of Organization. Well, if it continued as a member-managed LLC, did the 2010 operating agreement reduce the members' fiduciary duties as permitted by Section 15-5B6A of the LLC Act, specifically Section 25 of the operating agreement said, members have no exclusive duties to the LLC by reason of other business, investment, or activity. Thus, the purchase of the bank loans by Habillard Securities, owned by McChesney, would not have constituted a breach of fiduciary, could therefore not be a basis for, there'd be no reasonable likelihood of success on that claim as a basis for the preliminary injunction. Finally, and not finally, but most importantly, I want to come back to this notion that if a purported member, civilians don't understand the law, you say Mr. McChesney, in fact, our lawyers don't understand the law. If Mr. McChesney, because of the capital fault. Wait, wait, wait, let me, the K-1. The K-1. Isn't the K-1, does that mean more than a hearsay statement that whoever prepared that document thought that he had no interest in the corporation, the LLC? Well, I don't remember the precise directing and cross-examination, but I asked him, you know, who provided this information? Well, they provided the information to the accountant. I'm not saying it's not admissible, you know, but your argument seems to be that that K-1 establishes beyond, as a matter of law, that he didn't have any interest in it. It's just a statement by whoever prepared the thing that they didn't think he did. Right? There's another piece of evidence. Another piece of evidence? I don't know how you determine. I mean, let's go back to that e-mail that was sent two days after the, no, not that e-mail. The August 20th e-mail sent by Ryan immediately after the execution of the new operating agreement, requesting capital, saying, we have all the proper signed agreements for ORT. August 20th. It was Exhibit 10. August 20th. As we inject capital, our ownership shares increase. We are covered. He's sending to these guys. The opposite of that is, and I ask him, well, what happened here? Well, we decreased the ownership shares of Mr. Jobe and Mr. McChesson. We took shares away because they didn't add in. They were eliminated. So if they don't have, I mean, I think it's a critical question. And I recognize what the court's saying. I mean, there's additional evidence. But you've got this additional testimony saying we're going to change the ownership interest, and it's documented by that. Okay. I'm not raising that point. I'm just talking about the K-1 as to whether or not this is some kind of granite tablet that establishes by itself that. I don't think it's a granite tablet, but I am kind of concerned about the notion of non-tax-query. But you're making this statement to the IRS that this person no longer has a zero interest in the LLC, zero interest in the profits, zero interest in the distributions. That's pretty significant. Well, it is, but it's a statement by whoever prepared that document. Additionally, you know, the operating agreement provided, the new operating agreement, Section 12 says a member must have a percentage interest, shall own. The voting rights are based upon the percentage interest. Section 19. Section 16 provides the allocation of profits is based upon a percentage interest. If you're telling him at various times, you're out. That was the summer meeting in 2011, and I itemized these on page 37 of my brief. If you're telling him, if you're giving him a tax statement that says you've got a zero interest, at what point in time does the guy go, I've got no interest? If he's got no interest, then he's got no fiduciary duty. Well, there was testimony from Ryan that he had an 18% interest in March and April of 2012. Yeah, and I never quite understood what that testimony was about, other than he. He said he had an 18% share in ORT. And I know the exhibit. I looked at the exhibit. All it was is a review of the allocations that Mr. Ryan was going to be making, an accounting allocation, giving credit. Now, think about this. Giving credit to Mr. McChesney for the rent that had not been paid, ag resources. 18%. Yeah. And as a result, that would be an 18% interest. Just because he says it's now 18%. And by the way, why would he, why would Mr. McChesney get credit for rent that was due to ag resources, of which he was a limited liability company member? It would not be his money. He's just a member of the LLC. It would be an obligation owed to ag resources, which by the way, ag resources had an obligation owed to the bank on its mortgages. You could not make a unilateral distribution. You couldn't jump over the LLC and say, we're going to give you, Mr. McChesney and Mr. Ruslanis, who is the other 50% owner of the LLC, and give you the money that's owed to ag resources, and we're going to credit that as an equity contribution to the LLC. You can't do that. I mean, part of the reason I'm asking some of these questions and some background to this case is that we're reviewing a preliminary injunction case, correct? Right. And I know that HRS is trying to get us to decide some facts on appeal, but really are facts at the end of the line, not normally taken up in a review of a preliminary injunction case. Isn't it correct that legally what you need to show at a preliminary injunction hearing is there's a fair question of the existence of rights that are claimed? Fair question, isn't that? I agree with that statement. Okay. Well, if it's a fair question, and you've got a lot of these conflicting kinds of pieces of evidence that are being presented, doesn't that suggest a fair question is being presented? I disagree there, and here's why. This is a substantial record. I know the court's seen it. We did three days of testimony. We got binders and exhibits. The facts are undisputed. There's no fair question of facts. These are the facts. Now, based upon those facts, can you apply the law? Well, my objection is, in paragraph 79 of the order, the court sort of leaps to the conclusion that Mr. McChesney continues to be a member of ORT, notwithstanding the testimony that was entered. And granted, his attorney said, gee, he can continue to be a member, but the overwhelming testimony where Mr. Ryan goes to the meeting with the bank for purposes of obtaining a loan from a federally insured depository institution and says he's out, he's not a member. For what it's worth, there's additional evidence. It's undisputed. The K-1 says he's no longer a member. The same guy has an 18% in April 2012. When I come back, I'll identify that exact exhibit. But again, the testimony of that exact exhibit, if you look at it, was he was giving him credit for the rent that was due agresources. Now, how can you do that? How can you say we're going to give you credit and increase your percentage for the rent due agresources? You cannot do that. It's not his money. It's the money of agresources. Agresources had not been paid rent. I don't know where my time is, but I want to go back, if I might, just talk about the other issue why the preliminary injunction was improperly granted, and that is the agresources borrowed money from the bank. The agresources wasn't being paid by ORT, the tenant. Agresources stopped paying the bank. The bank filed a foreclosure action. The bank then subsequently assigned the mortgage in January 2012 to Happy Hour Securities. If the bank was here today, would the bank be prevented from foreclosing because there was this purchase agreement that was entered into after the mortgage was reported? Absolutely not. Nothing has changed. If you draw up an organizational, cross-organizational chart of all these different organizations, and you've got McChesty being a member at certain times with quite a few of the different ones. That's correct. All over the place. All three of them. All over the place. You've got lines crisscrossing and so forth and time periods. You've got conflicts on the testimony, and I mean on the evidence, of what time periods who belonged to what. Correct? See, I don't see that many. I don't see conflicts. There may be little nits here, but I think the statements are facts. The first 50 paragraphs that Judge Mangieri put together are pretty good. I mean, it's there. Those are the facts. That's how you're going to get improved with age. I mean, essentially, to be upheld here, that would have to make some showing there was a fair question that McChesty interfered with the ORT purchase. Well, yeah. If I might talk about that. Also, he breached fiduciary duty to ORT members if he's part of that organization. Exactly. Let's talk about the first one. The first point you make, which is did he in some way breach? Well, look, ORT had a contract with AgriSources. AgriSources breached that contract, but the limited liability numbers of AgriSources under 10-10A, I believe it is, they're not liable for the performance of that purchase agreement. That's the whole purpose of limited liability. There's nothing in the law that would permit ORT to compel Ruslanis, who's now bankrupt, or McChesty to complete the contract for AgriSources. The next aspect of that is that now you've got AgriSources could not have completed the contract because it needed to pay the $730,000 mortgage that was in default, and the bank was uncrivical about the fact they weren't going to accept less than all of the payment on that mortgage. They weren't going to carve off a piece, notwithstanding the fact there'd be these conversations when the ORT people came in in April of 2010 and said, we want to borrow $1.1 million to do all these things. All these conversations, but it never came to fruition. No loan agreement ever came to pass. And now the bank files the foreclosure to get it paid. The bank decides it's the HRS. Well, the ORT has established that they had a contractual right to obtain an ownership interest in the ORT slash AgriSources purchase agreement, the one in August of 2010, right? Absolutely, but as a matter of law, that can't trump the mortgage. And they claim that right still exists. But they can't trump the mortgage. And so they have no likelihood of success on this matter with regard to the foreclosure of the mortgage. There is no way they could trump the mortgage. And at the end of the day, isn't that your best argument? That's the argument we've run with. Absolutely. I mean, there's no – they ask for specific performance, and we said you can't have specific performance as to the assignee of the bank because your purchase agreement was entered into after the bank. It doesn't pay off the mortgage. And hence, the bank doesn't. Yeah, the bank filed the foreclosure and then four months later assigned the agreement to Happy Hour Securities. And who owns Happy Hour Securities? Mr. Chesney. And I leave on this thought. Section 15-3E of the Limited Liability Company provides a member does not violate a duty merely because his conduct furthers his own interest. Well, here's Mr. McChesney. He's the guarantor of the Happy Hour Securities. Mr. Ruslanos, both of them have bankruptcy problems. He's coming out. We find out shortly thereafter Ruslanos goes in. He takes a step to protect himself, not a violation of duty on the limited liability, by creating an entity that buys the mortgage and then proceeds to foreclose the mortgage. Thank you. By the way, that foreclosure was stayed by the court in this case, right? Correct, yes. That's part of the injunction order. Thank you. Mr. Griffiths? Griffin, I'm sorry. I apologize. That's all right. May it please the Court, Counsel. My name is Patrick Griffin, Counsel for the Applee-Opaqua River Terminal, which I'll refer to as ORT, as well as the individual appellees. It is, of course, critical to point out the proper standard of review. A trial court's order which grants a preliminary injunction is reviewed on an abuse of discretion standard. That is, the order will be overturned only where no reasonable person could take the position adopted by the trial court or, alternatively, where the trial court has acted arbitrarily, ignored, recognized legal principles, or otherwise clearly exceeded the bounds of the law. The court's findings of fact are reviewed against the manifest weight of the evidence standard. Under that standard, factual findings will be dismissed only where, upon review of that evidence, viewed, by the way, in a light most favorable to the prevailing party, only an opposite conclusion could have been reached. In this case, Judge Mangieri had the benefit of three days of testimony, during which time he had the opportunity to observe firsthand the testimony and the credibility of the witnesses. He had further the benefit of written arguments submitted by all parties after the close of evidence. And finally, Judge Mangieri took the time to present a detailed order granting the preliminary injunction where he made 50 separate findings of fact, all of which were directly tied to the evidence adduced at the preliminary injunction hearings. His order further went on to establish each of the required elements for granting a preliminary injunction. That order cited to the controlling authority, further cross-referenced the evidence, and finally concluded, we believe correctly, that ORT had properly established its case for preliminary injunctive relief. Before I address certain of the substantive arguments that counsel has raised, there are a couple of important items of procedure. First is that the court has denied requests of both AGRA sources, LLC and Curt McChesney, this court, to join in the appeal as they failed to timely file any notice of appeal. That is important, I think, because as the court is aware, Mr. McChesney wears a number of different hats in this litigation, and in fact has multiple roles in conflicting allegiances, is why we're here to begin with. Recall that Mr. McChesney is a member of AGRA sources, the original defendant mortgagor in these foreclosure proceedings. He is also a member of ORT, the tenant and contract purchaser of a portion of the underlying property. And finally, most recently, he is a member of Happy Hour Securities, an entity he formed for the sole and express purpose of buying out the underlying note and mortgage and terminating ORT's interest and ability to conduct its river terminal operations. He also owns MAG Farms, right? He's part owner of MAG Farms? No, actually, Peter Ruzanellis was the owner of MAG Farms, and that entity was subsequently substituted for Peter Ruzanellis. Okay, all right. Thank you. So McChesney's mother was never involved in MAG Farms? I believe that was Mr. Ruzanellis's entity. M&K Farms was an entity that Curt McChesney's mother was involved in. That's the entity that subsequently filed for bankruptcy. All right. In any event, it matters because Curt McChesney individually and AgriSources, it prevents, excuse me, the preliminary injunction order prevents Curt McChesney individually as well as AgriSources and Happy Hour from interfering with ORT's business operations. So in that respect, we believe Mr. McChesney's trade has essentially already left the station. The injunctive relief awarded against him and AgriSources stands, and he cannot now avoid the dictates of that order simply by throwing on a different hat, in this case the Happy Hour securities hat. The second, and probably relatively minor procedural matter, deals with the fact that Happy Hour has raised for the first time on appeal, and in fact actually for the first time in the reply brief, an argument that the Illinois Credit Agreement Act applies to these set of facts. Respectfully, we do not believe that it does, and in any event, I think it's an improper argument at this point. On to the substantive matters. The trial court properly began its legal analysis by identifying the legal standards for granting a preliminary injunction. Namely, number one, the possession of a property interest or clearly ascertainable right. Number two, the lack of an adequate remedy at law. Number three, irreparable harm in the absence of the injunction. And finally, number four, the likelihood of success on the merits. And it properly found that ORT had satisfied these elements based on the multiple real estate interests at stake, including in particular the ORT purchase agreement for the eight acres of property. Happy Hour never really seriously challenges these first three critical elements of injunctive relief, and in fact, we wait until page 41 of the opening brief before those critical questions are addressed. Interestingly, Happy Hour never addresses, not at all, not in its opening brief and not in its reply brief, the one case, Heritage Standard Bank and Trust, which is relied on both by the appellee and by Judge Mangieri to establish the claim for relief. The failure to address that case I think is fatal, but it would also have been futile because there really can be no doubt, based on the unrebutted evidence in the trial court, that ORT satisfied each and every one of those elements. The unrebutted evidence established that a failure to grant a preliminary injunction would have resulted in the almost immediate and complete termination of ORT's river operations, river terminal operations, and that is precisely what the court found. Rather than addressing Heritage head-on, Happy Hour did cite the two cases which I would submit have nothing really to do with the facts presented in this case. The France case dealt with a limited partner suing a general partner for the money it claims it lost by virtue of the general partner's sale of a partnership asset for below market value. And the Passan case simply stands for the proposition that a trial court may not enter a preliminary injunction unless an evidentiary hearing is held. Obviously, neither of those circumstances is really relevant in this case. Which brings us to the likelihood of success on the merits, and in that respect, it is important again to point out the proper standard, as the trial court did, in citing the C.D. Peters construction case. That case says that a party seeking a preliminary injunction is not required to prove the case, which would entitle it to relief on the merits. Instead, the party is merely required to raise a fair question as to the existence of those rights. Once that fair question has been raised, as it was here, the court should preserve the status quo until the case can be decided on the merits. And that, we would submit, is exactly what Judge Mangieri did. Now, I know this court has fully reviewed the briefs, as well as the order granting the preliminary injunction, so rather than simply repeat those arguments or recite the court's ruling, I did think it would be helpful to focus on three key areas, as time permits at least, where we believe happy hour simply gets the argument wrong. The first is that this case has nothing to do with piercing the corporate veil. To begin, ORT has never presented that argument to the court, not in its pleadings, not in its argument to the court, and the court has never considered such an argument, nor did the court rely on any kind of an argument of piercing the corporate veil when it entered its order granting the preliminary injunction. Second, we respectfully submit that counsel has the facts completely backward when he embarks on a piercing the corporate veil analysis. This is not a case where happy hour securities owed a duty to ORT, and ORT is now pursuing happy hour securities and then hopefully piercing the corporate veil of happy hour securities in order to get to the individual, Mr. McChesney. Rather, it's just the opposite. Kurt McChesney is the one, in the first instance, who owed the duty to ORT. It's Kurt McChesney who we claim breached that duty, and it's Kurt McChesney who, through his individual actions, both on his own and through formation of additional entities such as happy hour, created liability for both himself and happy hour. So we submit that the piercing the corporate veil argument is not proper, at least at this point. Certainly, on remand, if the record is developed further and that becomes a viable argument, we'll cross that bridge at the appropriate time. Second, Kurt McChesney is a member of ORT, regardless of which operating agreement is ultimately deemed to be controlling, and he has a fiduciary duty obligation to ORT which he unquestionably breached. When I address this issue, what comes to mind is an old refrain for certain criminal law clients, and that is, I wasn't there. If I was there, I didn't do it, and if I did do it, it wasn't my fault. We have a similar sort of dynamic at play here with Mr. McChesney. His refrain is, I wasn't a member, unless I wanted to be. If I was a member, I had no duties, and if I did have a duty, I can get around it by cleverly acting through a new entity. Fortunately, Mr. McChesney's refrain does not follow the law. The law, we think, is pretty clear, and it's interesting because the cases that are cited by counsel regarding fiduciary duty and the Limited Liability Company Act are all pre-2010 cases, the Catrus case, the Federal Alpha case, and the Geddes case. All of them are pre-2010, and that's important because in 2010, the Limited Liability Company Act was amended to actually expand the duties of members of manager-managed LLCs. Prior to that amendment, members only owed a duty, excuse me, members of a manager-managed LLC, only owed a duty where there was specific language in the operating agreements itself pursuant to which that member could exercise management authority. The revised statute expands that duty by eliminating the writing requirement. In other words, effective January of 2010, if a member acts in any way, in any capacity, consistent with that of a manager, the fiduciary duty applies. And that's particularly important in this case because Mr. McChesney has inserted himself over time in those types of decisions, including in June of 2011, acting in the capacity as objecting to a real estate transfer. Those are not activities that are typically associated with a merely passive investor. It's interesting, McChesney desperately wants the second operating agreement to be effective, and he does that because he wants to take advantage of what he perceives to be protection under the Act. But really, regardless of which agreement he's controlling, they both identify him as a member, as does McChesney himself from time to time, when it suits his needs. At the end of the day, though, whether ORT is a manager-managed LLC or a member-managed LLC, number one, we don't think ultimately it's going to make a difference. But number two, that's determined based on the language of the statute. And the statute is very clear. The statute says that a manager-managed company is one so designated in its Articles of Corporation. The unrebutted evidence in this trial is that ORT was not designated as a manager-managed LLC, and therefore, as a matter of law, it is a member-managed LLC unless and until its Articles of Organization are amended. Well, under the terms of the document, because they were a member-managed LLC, each of them would have the ability to submit those articles. There was no single member identified in the original operating agreement that would have said this person or that person was responsible. I'm sorry. There was no one charged with that responsibility in the document. I think the evidence suggests that both Bob Ryan and Dave Jobe typically handled that paperwork for the entity. That's accurate. That's the testimony. And if I could comment on that. What that K1 shows, it does not say that he's not a member. And it does not say that he has no interest. In fact, if he were not a member of ORT, he wouldn't be getting a K1 at all. What that document says is that he has a 0% profit and loss interest in the entity at that time. And it's important because in that type of entity, you might have a 20% interest one year. You might have a 1% interest the next year. You might have a 30% interest the following year, depending upon the capital infusions of the various members. Justice Carver, you mentioned the subsequent allocation that was prepared by Bob Ryan. What he was doing there is trying to keep a running total of what everybody's participating percentage is. I doubt that if in 2012, Mr. McChesney's K1 shows that he's an 18% member, that the council is going to automatically say he's right. It's an 18% membership. But that, in fact, is what they do. They adjust based on everybody's participating percentage. If I could just finally hit on this third point that I think is in dispute. Council spends an inordinate amount of time in his brief discussing the issue of notice and priority. And respectfully, we think that that has really nothing to do with this case. There's no question that the mortgage predated the purchase agreement. But in this case, where notice does become important is in their defense of impossibility of performance. Because all the cases are very clear that a purchase contract, if you're a contract purchaser, you're entitled to pursue a claim for specific performance. You're entitled to that sort of injunctive relief. In this case, what they're saying is, well, that may be the case, but we couldn't have performed because your purchase price, $225,000, was not sufficient to pay off the $650,000 mortgage. So the reason notice is important here is because the YPI case says very specifically, you can only utilize that defense if you had no notice of those facts at the time you entered into the agreement. And in this case, there's no question that both parties to the agreement, actually there are three parties to the agreement. There's the buyer, ORT. There's the seller, Agrisources. And there's the estroee under that agreement, which was the bank, First State Bank of Illinois. All three of them knew that the purchase price was $225,000. All three of them knew that the mortgage was $650,000. And the agreement, and in fact the testimony of Wood Stortson, who was an officer of the bank, was that that was going to be sufficient for First State Bank of Illinois to issue a partial release. That was the agreement. That problem, to the extent it was one, is now gone entirely because First State Bank has been paid off and the only individual who has to provide a release today is Kurt McChesney himself on behalf of our securities. So again, respectfully, we believe that the issue of notice and priority is not relevant other than in that sense. And that concludes my argument. Thank you, Mr. Griffin. Thank you. Mr. Howard, some rebuttal. Yes, sir. Please, the court. Let me start at the end. This is on the record, page 689, the testimony of Omar Bradley. I cite this in my brief. I believe it's page 15. That's the banker. The banker. Question. I take it from the flip side of that, the bank never agreed to authorize the sale of a portion of the property for $225,000 or $250,000. Is that correct? Answer, that's correct. Undisputed testimony. What he just said. There's no evidence. And merely the banker signing his escrow wreath for taking $10 on August 18th doesn't mean the bank has agreed to release for less than the $700,000 or so. Never has and never will. Now, go back to Justice Carter, your comment. It's exhibit 16. This is the document. It was introduced in evidence where Mr. Ryan said, well, this is now what the percentages are. Well, as of June 5th, 2011. But you know what? That little handwritten note, that's not an accounting record of ORD. It was never offered as a business record that this was the statement of the ownership interest. This was merely something, well, this is, we had a discussion about what could happen. And, again, I want to verify, you're talking about giving credit to Kurt for an account receivable due, agri-sources LLC. Sort of circumventing the whole LLC notion. But it was never agreed to by the parties. There's no record, no testimony, nothing. This was agreed to by the parties. And then, of course, subsequent to this, in July of 2011, they had the meeting where everybody at the meeting said, Mr. Ryan said he's not a member of ORT. Now, if it was just one disparate fact, that would be fine. But it's not disparate facts. It's a whole body of facts, uncontested facts. Subsequent to that, they filed a late filed annual report. It took Joe off, who didn't sign the 2010 operating agreement, but they left our guy on. But that was the report for the prior year. And, yes, you know what? If you exit, I'm not a tax lawyer, but if you exit an LLC during the year, you're going to get a final K-1. And so the suggestion, which is not in the record, there's some subsequent K-1 out there. I mean, I don't know how you can go there. So, oh, the next point, the heritage case. The heritage case was an action by a purchaser versus a seller. That would be count two, the action by ORT versus AgriSources. AgriSources can't perform. There's no evidence that AgriSources has anything other assets than the ownership interest in this real estate. It's not an action against the mortgage assignee or the bank. There's no way you can compel the bank to release its mortgage absent satisfaction of that mortgage. Therefore, the heritage bank case is inapplicable. Because what they're attempting to do is they want to block the foreclosure by the bank on the basis of a contractual action between the purchaser and the seller that can't be performed unless they pay the bank in full. And that's what we'd like to have done. Now, which operating agreement controls is absolutely critical to the resolution of this case, and I would ask the court to review this issue and give us a decision because the facts are undisputed. They ain't going to get any better. You know, the parties acted consistently with it being manager-managed. If it's manager-managed, the member, Mr. McCheskey, has no duties, period. And if it's manager, and if he's been eliminated as an owner because they reduce his interest to zero, he has no duties. You can't have breach of a duty. And then finally, if the operating agreement controls, Section 25 provides, then he can have other interests because he's merely a member. And if he has other interests, he's buying bank loans in competition with the business of ORT. Granted, these people are all interrelated, but the fact of the matter is they have created these entities and they are operating under these entities, and under the Limited Liability Company Act, Mr. McCheskey has no liability for the failure of AgriSources to comply with its agreement with ORT. HRS, FBI Securities, has no fiduciary duties to ORT. There's no basis. Let me conclude. Maybe I'd better get a minute here. In conclusion, it's our argument that the trial court improperly granted ORT's motion preliminary injunction preventing Happy Hour Securities from collecting rent, from foreclosing on the mortgage, because ORT has no likelihood of success in the merits of its specific performance claim against Happy Hour Securities. The purchase agreement was entered into after the mortgage was recorded. Plus, there was no breach of fiduciary duty because McCheskey was no longer a member. The evidence shows that, undisputed. And if he was a member, then he did not breach the fiduciary duties under the 2010 operating agreement, which permitted the formation of other businesses, other investments,  Happy Hour Securities requests the court reverse the order to grant a preliminary injunction. I may have further proceedings. Thank you. Thank you, Mr. Howard. Mr. Griffin, thank you for your arguments here this morning. This matter will be taken under advisement. A written disposition will be issued. We'll be in a brief recess for a panel change before the next case.